[Crim. No. 4155.   Second Dist., Div. Three.   Mar. 3, 1948.]

THE PEOPLE, Respondent, v. GAIL K. MEACHAM et al., Defendants; BERT R. HUGHES, Appellant.

James A. Starritt for Appellant.

Fred N. Howser, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

WOOD, J.—Defendants Hughes, Brighton and Meacham were charged jointly with robbery while armed with a revolver. Each one asserted an alibi as a defense. In a trial by jury they were found guilty as charged. Defendant Hughes appeals from the judgment and the order denying his motion for a new trial.

He contends that there is no substantial evidence of his guilt; that the court erred in its instructions; that the trial was unfair as to him; and that the court abused its discretion in denying his motion for a new trial.

On October 23, 1946, about 12:10 a. m., Jesse R. Heagy was on duty as the operator of a Mobil gasoline service station on Sherman Way near Van Nuys. At said time three men walked from the street into the station premises, and one of them went to the operator and asked him where a certain beach was located. The operator then went to his coupe automobile to get a map, and as he reached therein the man (defendant Meacham), who had asked the question, hit him on the head, pointed a loaded revolver at him, and compelled him to sit in the automobile. Meacham then stood about 5 feet from the operator and continued to point the gun toward him. Defendant Brighton went inside the service station building, and the third man walked up and down in front of the station, and on several occasions went into the station and then returned to the front again. The three men were there 10 or 15 minutes, and they took about $5 from a money box in the station, about $50 from the pocket of the operator,

and a carton of cigarettes from the station. Then they compelled the operator to get into the back of his coupe automobile through a space at the back of the seat. It was a very foggy night. When he was in the back of the automobile they left, and soon thereafter he heard an automobile motor start and, from the sound of the motor and from the outline of the automobile (in the fog) as he saw it go away from across the street, he thought it was a 1939 or 1940 Buick. It is 14.5 miles from the service station to the place where Hughes lived.

The operator testified that the defendants Meacham and Brighton were two of the men who committed the robbery; and that he did not recognize defendant Hughes as the third man, or as anyone, who was at the robbery. One Barnes, called as a witness by plaintiff, testified that he was living with Meacham at the date of the robbery; that he had known the three defendants about four months; that he saw the three defendants on October 23, 1946, between 1 and 1:30 a. m., in front of Meacham's house, in a 1940 or 1941 Buick sedan automobile; that Hughes was in the driver's seat; that one of them had a .32 automatic pistol at that time and he thought it was Brighton who had it; that they said they ''had just pulled a job''; that Hughes asked him (witness) if he wanted to ride, and then Meacham and Brighton got out of the automobile, and the witness and one Bob Copeland and two girls (who were with the witness) got into the automobile; and that they drove around Hollywood until about 4 a. m.

Officer Wendt testified that he saw Hughes on October 23, 1946, about 12:15 p. m. when Hughes drove a 1941 Buick sedan automobile to the front of Meacham's house and parked it there.

Officer Gidney testified that he asked Hughes some questions on October 24th, about 9 a. m., at the police station, and that Hughes answered voluntarily, that his answers were not given under any threat or undue influence, and that no promise of reward or immunity was extended to him. When the officer was asked to state that conversation, Hughes stated that he challenged said statement of the officer regarding the circumstances under which the answers were given. Thereupon, the court permitted Hughes to testify at that time concerning those circumstances. He testified that, under threats by the officer, he confessed to many crimes during that questioning; that the officer cursed him, said he would kick him in the testicles until he told him what he wanted to hear; that the officer charged him with auto stealing, hotel robbery and filling

station robbery; that when he denied those charges the officer grabbed a pistol, swung it around Hughes' face, and told him to tell what he wanted to hear; that Hughes then said he ''confessed'' that he stole a car, and that he ''pulled a station robbery'' at Mr. Heagy's station. The deputy district attorney then said that he expected to make similar proof as to the other defendants, regarding the voluntary character of their answers to questions which the officer asked them. Thereupon, the court permitted Brighton and Meacham to testify at that time concerning the circumstances under which they answered the officer's questions. Brighton testified that the officer, in the conversation with him, used words which Brighton understood to mean that he would kick Brighton in the testicles; that the officer asked him if he had been in the gas station, and Brighton replied that he had been there; and that he had been convicted of a felony. Meacham testified that the officer, in the conversation with him, said that he would beat him up if he didn't say he was at the Van Nuys robbery; that he told the officer to beat him up because he would not say he was there; and that he had been convicted of a felony.

Officer Gidney then continued his testimony and testified that he did not say he would kick any of the defendants, that he did not wave a gun in front of any of them or at all (he did testify later that ''In the course of investigation we know how to get truthful answers''); that at the time he began talking with Hughes he (the officer) did not know about this robbery on Sherman Way; that they had arrested the defendants on a previous investigation, and he told Hughes that he had a report of a robbery in the Valley, and he asked Hughes if he had been involved in a robbery there; that Hughes replied that he had been, and that he, Meacham and Brighton had been at a Mobil station in San Fernando Valley in the early morning of October 23d in Hughes' 1940 Buick sedan, that he thought it was on Sherman Way, that Meacham was armed with a revolver and Hughes had an automatic, that Hughes parked the car and went to the rear of the station, that he saw Meacham strike the attendant, that $4 was taken from the station and $20 from the attendant, that they ran back to the Buick and returned to 3721 Glen Feliz Street (where Meacham lived), and that they divided the money equally. The officer testified further that he had the three defendants together about 11 a. m. on said October 24th in the presence of three other officers and Mr. Heagy, the station operator

(Mr. Heagy had been to "the line-up" of the defendants and three others); that Mr. Heagy pointed out Meacham as the one who held him up, and pointed out Brighton as the one who was in the station, but he did not point out or recognize Hughes; that the officer asked Hughes if he had seen Mr. Heagy before, and he said he had; that he (officer) asked where he had seen him, and he replied that he was the attendant at the Mobil station on Sherman Way that they had held up; that Hughes said that $24 and a carton of cigarettes had been obtained; that Hughes then said to Mr. Heagy that he wanted to make restitution. The officer testified further that he first saw the revolver and the automatic pistol (exhibits for identification) in a drawer next to Meacham's bed at 3721 Glen Feliz Street, and that the revolver was loaded with five cartridges at that time.

Hughes testified that he lived in Glendale; that at 7 p. m. on October 22, 1946, he was at a restaurant in Glendale where his roommate, one Emmert, was employed; that after eating at that place he went to his home, lay down in bed and went to sleep; that he awoke about 11:30 p. m. and left his house about 11:45 p. m. in his automobile to go to the restaurant to get his roommate; that it was very foggy at that time; that after he had gone a few blocks a tire blew out, and while he was trying to change the tire the car fell from the jack; that he knew it was 12:12 when the car fell because the falling car broke his watch; that he finally put the spare tire on, and then drove to a near-by service station and put air in the tire; that when he arrived at the restaurant it was closed, and then he went to his home and his roommate was there; that it had been his custom to "pick up" Emmert when Emmert finished work, and that he (Hughes) had never missed picking him up before; that he told Emmert about the tire trouble, and then went out again to get something to eat; that just after he had finished eating in his car at a drive-in restaurant in Glendale, Meacham and Brighton came to his car; that he waited there while they ate, and then he took them to their home on Glen Feliz Street, Glendale; that when he arrived there Barnes (the witness hereinbefore mentioned) came to the car and asked where they were going; that Meacham and Brighton got out of the car and went into the house; that soon thereafter Copeland and two girls came to the car, and he took them and Barnes in his car and drove around all night before he could get rid of them; that he returned to his home about 4 a. m., and slept until 11 o'clock that morning; that he then

intended to go to Inglewood to apply for employment as an aircraft mechanic, and since Brighton had told Emmert about the opportunity for such employment, he (Hughes) went to call on Brighton; that he went to the house where Brighton and Meacham were living, and rang the doorbell, but there was no response; that he then went to the back door and knocked, and two officers "jumped out with guns" and arrested him. He testified further that, after he was on bail, he and Emmert went to a newspaper office in Van Nuys and ascertained where the robbery had occurred, and then they went to the service station to "see why I was taken in on it"; that at first he talked with a man there who he thought was the one who had been robbed, but he said he was the owner of the place and that the man who had been robbed was not there; that the owner asked the other man to come to the station, and after he (Mr. Heagy) arrived there Hughes talked to him; that Mr. Heagy said that Hughes was not one of the three men.

The landlady at the place where Hughes lived testified that on October 22, 1946, about 6 p. m., she saw Hughes' automobile parked across the street from her house; that about 10:30 p. m. of said day she saw his automobile at the same place; that it was terribly foggy that night; and that she went to bed about 11 p. m.

The daughter of the landlady testified that "about eleven or a few minutes after that" in the evening of October 22, 1946, she saw Hughes lying on his bed at her mother's house; and that she did not see him again until several days later.

Emmert testified that he roomed with Hughes; that on October 22, 1946, he (Emmert) worked at a restaurant until midnight and left there about 12:15 a. m. on October 23rd; that Hughes usually "picks me up" after work, but he did not show up that night and Emmert rode home with another boy; that he (Emmert) arrived home about 12:20 a. m.; that Hughes came in about 2 o'clock; that Hughes told him about the tire trouble, smoked a cigarette, and then went away again; that it was about "a quarter to one" when he (Hughes) left, and he did not see him until the next day; that after Hughes was on bail he went with Hughes to a newspaper office in Van Nuys and obtained the address of the station where the robbery occurred; that they went to the station and talked to Mr. Heagy and he said that he did not recognize Hughes as one of the boys who robbed him.

Brighton testified that on October 22, 1946, about 8 p. m., he was in a show at Seventh and Main Streets in Los Angeles; that he left the show about 11 or 11:30 p. m., and went to Colorado and Brand Boulevards in Glendale on a streetcar, arriving there "about a quarter after 12 or twenty minutes to twelve"; that a clock at that corner showed it was then "a quarter of twelve"; that he met Meacham there at 12:30 a. m., and they went to a drive-in restaurant, arriving there between "a quarter to one and one"; that as they were going to the door of the place they met Hughes; that after they had eaten there, Hughes took them to their home; that he and Meacham then sat on the porch about 30 minutes and then went into the house; that the officers came into the house "the next morning" and arrested them. On cross-examination he testified that he was not working at that time; that, after he left the show, he arrived in Glendale between "a quarter after twelve and twelve o'clock"; that at 5 p. m. on October 22nd he was in a jewelry store in Glendale, and that he had been convicted of assault with intent to commit robbery at that time in that store.

Meacham testified that he stayed at his home in the evening of October 22nd until approximately 12 o'clock; that he then left the house to meet Brighton at Colorado and Brand Boulevards; that he met him there about "10 or 15 minutes to twelve"; that they then went to a drive-in restaurant in Glendale, and when they arrived there it was "either a quarter to one or one o'clock" and they met Hughes who was sitting in the car; that after they ate at that place, Hughes took them to their home and they arrived there about 1:30 a.m.; that he thought he saw Barnes there at that time; that at 5:15 of October 22nd he was with Brighton in a jewelry store in Glendale, and that he committed the crime of assault with intent to commit robbery therein at that time, and that he was convicted of the crime. On cross-examination he said that he owned the revolver which was an exhibit in the case.

Appellant Hughes' first contention, above mentioned, that there is no substantial evidence of his guilt is not sustained. A detailed discussion of the evidence is not required to show that such contention is without merit. There was evidence as follows: that the other two defendants were identified positively as participants in the robbery; that this defendant was in a 1940 Buick automobile with those defendants in front of their house about 1:30 a. m., which was about an hour after the robbery, and at that time he was in the driver's seat, and one of them had a revolver, and one of them said that

they had just "pulled a job"; that the automobile which was used in the robbery was that same kind of automobile; that that midnight (when the robbery occurred) was the first time he had failed to pick Emmert up when Emmert finished work; that this defendant was at the back door of the house of the other defendants at noon following the time of the robbery; and that he admitted that he was present at and participated in the robbery.

■ Appellant contends that the court erred in refusing to give the following instruction: "When the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt." That instruction should have been given, but the refusal to give it was not prejudicial, in view of the instructions given and under the evidence here. The requested instruction was to the effect that each fact which is essential to complete a chain of circumstances establishing defendant's guilt must be proved beyond a reasonable doubt. That instruction related to the matter of reasonable doubt in connection with various evidentiary facts in a chain of circumstances. The court gave the usual instruction concerning reasonable doubt as to the ultimate fact involved, that is, as to defendant's guilt of the crime charged. That instruction (Pen. Code, § 1096) was to the effect that in case of a reasonable doubt whether his guilt, of the crime charged, is satisfactorily shown, he is entitled to an acquittal. In other words, the law as to reasonable doubt was fully before the jury as to the ultimate fact charged, but it was not referred to specifically regarding essential evidentiary facts. The court, however, did give the following instruction: "If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt." The court also instructed the jury fully in regard to the credibility of witnesses in general. Since the jury was instructed fully that in case of reasonable doubt as to defendant's guilt it should find him not guilty, and was also in-

structed that it must bring in a verdict of not guilty if there was any reasonable interpretation of the evidence that pointed to innocence, and was also instructed fully in regard to the credibility of witnesses in general, it appears that the failure to give the requested instruction, regarding reasonable doubt as applied to essential evidentiary facts, did not interfere, under the evidence herein which included an admission of guilt, with the substantial rights of defendant.

Appellant also contends that the court erroneously refused to give a requested instruction which stated in effect that a defendant in a criminal trial may not be compelled to testify, and that the failure of a defendant to deny or explain evidence against him does not create a presumption of guilt or by itself warrant an inference of guilt. In presenting that point he states that the defendant did testify, and denied and explained testimony against him, and that apparently the jury did not believe him. He argues that it cannot be known to what extent "they gave weight" to his testimony "merely because they disbelieved it and as a result of such disbelief." He argues further that since the jury "may have given improper and unlawful weight to the disbelief of his denials and explanations" he was entitled to the requested instruction. The argument that the jury gave weight, or might have given weight, to testimony it did not believe is not clear. The defendant was not compelled to testify, but he did testify. There was no necessity for an instruction that a defendant in such a trial may not be compelled to testify. When he did testify his testimony was to be considered by the same standard and rules as testimony of other witnesses. The members of the jury were properly instructed that they were the exclusive judges of the weight of the evidence, and they were properly instructed as to the subject of credibility of witnesses. The court did not err in refusing to give that requested instruction.

Appellant contends that the court erred in refusing to give his requested instruction to the effect that it is the duty of the judge to instruct the jury; that it is the function of the jury to try the issues of fact; that the jury should perform its duty uninfluenced by pity or passion or prejudice; that it must not be biased against defendant because he had been arrested, or accused or brought to trial, and that none of "these facts" is evidence of his guilt, and the jury should not infer or speculate from any of them that he is more likely to be guilty than innocent. He asserts that the refusal to give his requested instruction, except the part as to the duty of the

judge, "constitutes the principal error upon which appellant relies." Those matters involved in the requested instruction were covered by instructions which were given. The court did instruct the jury that the jury was present for the purpose of trying the issues of fact; that it should perform that duty uninfluenced by pity or passion or prejudice on account of the nature of the charge; that it should be governed solely by the evidence introduced and the law as given by the court; that the law will not permit jurors to be governed by mere sentiment, conjectures, sympathy, passion or prejudice; that it should carefully and dispassionately weigh and consider the evidence and the law and give to each its conscientious judgment. This contention is not sustained.

Appellant contends further that the instruction relative to the issue of alibi was insufficient and incomplete. The court gave the following instruction: "An alibi simply means that a defendant was at another place at the time the crime charged is alleged to have been committed. All the evidence should be carefully considered by you, and, if the evidence on the subject, considered with all the other evidence, is sufficient to raise a reasonable doubt as to the guilt of a defendant, you should acquit him. It is sufficient to justify an acquittal if the evidence upon that point raises a reasonable doubt of his presence at the time and place of the commission of the crime charged, if you find that a crime was committed." Appellant submitted an instruction concerning the matter of alibi, and it was refused. Appellant concedes, however, that the instruction given and the one requested by him "are substantially in accord, and are correct and in the ordinary case are sufficient." He argues that since the People's proof herein narrows the issue as to the time of the robbery to a matter of minutes (approximately 25 minutes according to appellant's computation), the court, of its own motion, should have narrowed such issues to a matter of minutes. It will be noted that the instruction given states that an alibi means that a defendant was at another place "at the time the crime charged is alleged to have been committed," and that the defendant should be acquitted if the evidence raises a reasonable doubt of "his presence at the time and place of the commission of the crime charged." The information charged that the crime was committed "on or about the 23rd day of October, 1946." Appellant asserts that, in order to meet the requirement of that instruction, the evidence as to alibi would have to cover all of the day of October 23rd. In support of his contention

appellant cites the cases of *People* v. *Morris,* 3 Cal.App. 1
[84 P. 463], and *People* v. *Waits,* 18 Cal.App.2d 20 [62 P.2d
1054], wherein judgments of conviction were reversed be-
cause the instructions therein did not narrow the issues as to
the time of commission of the offenses. Those cases are to be
distinguished from the present case. In the first case cited,
it was charged that defendant committed rape on a certain day,
and the particular act relied on by the prosecution occurred
at 4 p. m. in a certain house. The alibi evidence therein was
that defendant and the prosecutrix were at another place
from 2:30 p. m. to 6 p. m. of said day. In that case, con-
cededly, during the other part of that day they had been
together in the house where the act was alleged to have oc-
curred, and no one else was present. The instruction therein,
regarding the alibi, was to the effect that unless the jury
believed that rape was committed on the day stated in the in-
formation the verdict should be not guilty. The jury in that
case asked the trial judge whether it was limited in its con-
sideration of the evidence to the particular hour of the day
mentioned, and the judge replied that the charge was that
the offense occurred on the day specified. The reviewing
court therein held that the jury was told in effect that it
could consider the evidence with reference to the entire day,
and that in that view of the case the jury might have found
the alibi evidence sufficient to overcome the evidence of the
alleged act at 4 p. m., and yet found defendant guilty of an
act at some other hour of the day. In the second case cited,
*People* v. *Waits, supra,* the charge was violation of sections
288 and 288a of the Penal Code on a certain day between
10:30 a. m. and 1 p. m. Defendant therein produced alibi
evidence, and the court instructed the jury it was immaterial
on what day the offense was committed, if it was committed
within three years from the filing of the information. It was
held therein, citing *People* v. *Morris, supra,* that the trial
court should have limited the jury in its consideration of the
evidence to the time selected by the prosecution as the time
the offenses were committed. In the present case only one act
of robbery occurred and it was established that it occurred
within 10 or 15 minutes after 12:10 a. m. on October 23rd.
There was no claim at all that the robbery occurred at any
other time that day. The evidence as to alibi covered a period
of several hours before and after that time. It is wholly
unreasonable to assume that the jury, under the evidence here,
might have found that the robbery did not occur at said

specific time on that day, but that it occurred at some other hour of that day. This contention of appellant that the trial court should have given such an additional instruction is not sustained.

Appellant also asserts that the trial was unfair as to him, in that, the attorney employed by him was appointed by another judge, at the time of the arraignment, to also represent the other two defendants, and the trial judge should have ascertained that no conflict of interests "might" arise between Hughes and the other defendants.

At the preliminary hearing an attorney, Mr. J. U. Edwards, who was then appearing as counsel for Hughes, was appointed at the request of Mr. Edwards to also represent Meacham and Brighton. When the three defendants appeared for arraignment in the superior court before Judge McKay on November 18, 1946, Hughes appeared with his counsel Mr. Edwards and the other defendants appeared without counsel. The appellant asserts that Judge McKay then appointed Mr. Edwards to also represent the other defendants. The minutes of the court do not show that such an appointment was made, and the reporter's transcript does not show such an appointment. Judge McKay set the trial for December 13, 1946, in another department of the court before Judge Nye. The trial was postponed to January 17, 1947. Appellant asserts that on that date, before the trial commenced, Mr. Edwards and the deputy district attorney went into the trial judge's chambers, and Mr. Edwards stated that Meacham and Brighton would plead guilty to robbery in the second degree and that Hughes would plead not guilty, and that the deputy district attorney then said that unless all three defendants would plead guilty the People would not enter into such a proposal and would require all three defendants to proceed to trial. Neither the reporter's transcript, nor the clerk's transcript, shows anything with respect to such a meeting or any meeting in the chambers. Since the record does not show that Judge McKay or any judge appointed Mr. Edwards as counsel for Meacham and Brighton, and the record does not show that any proceeding occurred in chambers, there is no basis (except as hereinafter indicated) for the contention that the trial judge should have ascertained that no conflict of interests "might" arise. Hughes made a motion to augment the record to include a transcription of the reporter's notes of the proceedings had before Judge McKay at the arraignment, which notes, he asserted, show that Mr. Edwards was appointed to also rep-

resent the other defendants. In that motion he also sought an order directing that Judge Nye make a minute entry of the proceedings had in chambers, and that such minute entry be included in the clerk's transcript. Hughes' present attorney, Mr. Starritt, made an affidavit, in support of the motion, to the effect that the reporter's notes show such an appointment, and that the deputy district attorney who was present in the chambers at said time had informed him that such proceedings as those hereinabove mentioned were had in chambers. In opposition to said motion, an affidavit of said deputy district attorney was filed herein stating in substance that the proceedings in chambers were as hereinabove mentioned. Counsel for respondent and appellant have agreed that the matters alleged in said affidavits, as to the proceedings at the arraignment and in chambers, may be regarded as a part of the record.

In regard to this last-mentioned contention of appellant, he argues that by reason of the proceedings in chambers the trial judge was then apprised that it was probable that conflicting interests might appear between Hughes and the other defendants, and that it was the responsibility of the court to make inquiry "to the point of ascertainment that no conflict of interests between Hughes on the one hand and Meacham and Brighton on the other 'might' arise." In support of his contention he cites *Glasser* v. *United States,* 315 U.S. 60 [62 S.Ct. 457, 86 L.Ed. 680], and *People* v. *Lanigan,* 22 Cal.2d 569 [140 P.2d 24, 148 A.L.R. 176]. Those cases are distinguishable from the present case. In those cases specific objections were made to the appointments of counsel, and the circumstances were such that it was apparent there were conflicting interests. In the Lanigan case the defendants objected and the attorney who was appointed also objected. In the present case, assuming that Judge McKay appointed counsel for Meacham and Brighton, no objection was made by anyone at that time or at all to Judge McKay to the appointment, and there was nothing to indicate to him that there might be conflicting interests. From the time of the alleged appointment to the date of trial about 60 days elapsed and during that time no objection was made, and it does not appear at all that appellant or anyone, prior to the returning of the verdict, was not satisfied with the alleged appointment. There was nothing before Judge Nye to indicate even that the court had appointed Mr. Edwards as counsel for the other defendants. As above stated, there was no minute entry of

such an appointment. Insofar as Judge Nye is concerned there was nothing to indicate that the counsel appearing before him was not employed and retained by the defendants. The mere fact that such a proposal to plead guilty to a lesser offense was made did not place a responsibility upon the trial judge to inquire concerning the circumstances of the employment or selection of the attorney appearing before him, or to inquire as to whether there might be conflicting interests among the defendants. No objection was made before Judge Nye, by appellant or Attorney Edwards or anyone, at any time before the verdict was returned regarding any probable conflict of interests. It cannot be held that the trial judge or the judge who arraigned the defendants erred, or failed in any responsibility that was upon either of them, in the matter of affording defendants or any of them an opportunity for proper representation by counsel. This contention of appellant that the trial was unfair as to him is not sustained.

Appellant also contends that the court abused its discretion in denying his motion for a new trial. The motion was made upon all the statutory grounds, and particularly upon the ground of newly discovered evidence. In support of the motion he filed his affidavit which stated that after the verdict Brighton had informed him that Brighton, Meacham and one Berle Franklyn had committed the robbery. That affidavit stated further that Mr. Heagy would testify that the third man at the robbery appeared to have blond hair. He also filed an affidavit made by Brighton which stated that he, Meacham and a man named Berle Franklyn had committed the robbery, and that Hughes was not present; and that he did not disclose this information to Hughes or defense counsel or anyone until after the verdict because he thought it would jeopardize his chance of acquittal. He also filed an affidavit of Mr. Heagy to the effect that the third man at the robbery was about the same size as Hughes but his features appeared to be different and it was his impression that he had blond hair. The affidavit of Brighton established that he swore falsely, either at the trial or in the affidavit. The evidence in the trial showed that Brighton had been convicted about a week previously of assault with intent to commit robbery. The affidavit of Mr. Heagy was cumulative, except as to the statement about the hair. He was cross-examined extensively at the trial, and appellant of course had an opportunity at that time to ascertain his testimony about the color of the hair. It was for the trial judge, in his discretion, to determine what weight, if any, to give to

Brighton's affidavit, and to determine whether due diligence had been exercised in regard to the color of the third man's hair, and to determine whether it was probable that a different verdict might have resulted if such different or additional evidence had been received. The trial judge did not err or abuse his discretion in denying the motion.

The judgment, and the order denying the motion for a new trial, are affirmed.

Shinn, Acting P. J., and Vallée, J. pro tem., concurred.

A petition for a rehearing was denied March 16, 1948, and appellant's petition for a hearing by the Supreme Court was denied April 1, 1948.